UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

BRIAN H. ROBBINS                                                                    PLAINTIFF

v.                                                        CIVIL ACTION NO. 3:15-CV-609-DW

CAROLYN COLVIN, Acting Commissioner of Social Security                DEFENDANT

## MEMORANDUM OPINION

Plaintiff Brian H. Robbins has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied his

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

Robbins applied for DIB on Aug. 15, 2011, and SSI on Aug. 19, 2011 (DN 127), alleging that he

was disabled as of May 1, 2011, due to a cerebral vascular accident ( stroke) and residual effects

that included periodic paralysis of his left leg, numbness in the left hand and arm and pain the

left bicep (Tr. 148). The Commissioner denied Robbins' claims on initial consideration (Tr. 63-

78, 79-80, 81-96, 97-98) and on reconsideration (Tr. 99-100, 101-102, 103, 104-105). Robbins

requested a hearing before an Administrative Law Judge (ALJ) (Tr. 118-119).

ALJ Roland Mather conducted a hearing in Louisville, Kentucky, on Sept. 3, 2013 (Tr.

32-62). Robbins attended with his attorney, Walter McGee (Tr. 32). He and vocational expert

(VE) Kenneth Anchor testified at the hearing (Tr. 34-55, 56-62). Following the conclusion of

the hearing, ALJ Mather entered a hearing decision on Oct. 25, 2013, that found Robbins is not

disabled for the purposes of the Social Security Act (Tr. 13-31).

In his adverse decision, ALJ Mather made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through March 1, 2013.

2.      The claimant has not engaged in substantial gainful activity since May 1, 2011, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3.      From May 1, 2011, through May 1, 2012, the period during which the claimant was under a disability, the claimant had the following severe impairments: history of cerebral vascular accident with residual effects –hypertension, and history of artery stenosis (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      From May 2, 2011, through May 1, 2012, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that, from May 1, 2011, through May 1, 2012, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he could only walk for 10 feet, stand for two minutes and sit for 20 minutes at a time.

6.      From May 1, 2011, through May 1, 2012, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      The claimant was a younger individual age 18-44, on the established disability onset date (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 C.F.R. 404.1568 and 416.968).

10.     From May 1, 2011, through May 1, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1560(c), 404.1566, 416.960(c) and 416.966).

11.     The claimant was under a disability as defined in the Social Security Act, from May 1, 2011, through May 1, 2012 (20 C.F.R. 404.1520(g) and 416.920(g)).

12.     The claimant has not developed any new impairment or impairments since May 2, 2012, the date the claimant's disability ended.  Thus, the claimant's current severe impairments are the same as that present from May 1, 2011, through May 1, 2012.

13.   Beginning May 2, 2012, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1594(f)(2) and 416.944(b)(5)(i)).

14.   Medical improvement occurred as of May 2, 2012, the date the claimant's disability ended (20 C.F.R. 404.1594(b)(1) and 416.944(b)(1)(i)).

15.   The medical improvement that occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity (20 CF.R. 404.1594(b)(4)(i) and 416.994(b)(1)(iv)(A)).

16.   After careful consideration of the entire record, the undersigned finds that, beginning May 2, 2012, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he may not climb ladders, ropes or scaffolds and he should only occasionally climb ramps and stairs.  He must avoid concentrated exposure to machinery and he should never work around unprotected heights or uneven ground.  He should work in a stationary position that does not require a lot of walking and he will need a cane in the non-dominant hand when performing extended walking.

17.   The claimant is still unable to perform past relevant work (20 C.F.R. 404.1565 and 416.965).

18.   The claimant's age category has not changed since May 2, 2012 (20 C.F.R. 404.1563 and 416.963).

19.   The claimant's educational level has not changed (20 C.F.R. 404.1564 and 416.964).

20.   Beginning on May 2, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, and Appendix 2).

21.   Beginning May 2, 2012, considering the claimant's age, education, work experience and residual functional capacity, there have been jobs that existed in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c), 404.1566, 416.960(c) and 416.966).

22.   The claimant's disability ended on May 2, 2012 (20 C.F.R. 404.1594(f)(8) and 916.944(b)(5)(vii)).

(Tr. 21-27).  Robbins sought review of the hearing decision by the Appeals Council (Tr. 9-12).

The Appeals Council denied his request for review, finding no reason under the Rules to review

ALJ Mathers' decision (Tr. 1-6).  The present lawsuit followed.


**The Five-Step Sequential Evaluation Process.**

      Disability is defined by law as being the inability to do substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of not less

than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for

DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20

CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the

claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the

claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See,*

*Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

      If the claimant is not working, then the Commissioner next must determine at step 2 of

the evaluation process whether the claimant has a severe impairment or combination of severe

impairments that significantly limit his or her ability to perform basic work activities.  See 20

CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined

by the Commissioner to be non-severe, in other words, so slight that they could not result in a

finding of disability irrespective of a claimant's vocational factors, then the claimant will be

determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988);

*Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

6

**Background Information.**

      Plaintiff Brian Robbins was 40 years old at the time of the administrative hearing (Tr. 35) being born on April 10, 1973.  He has a 12th grade education and was 38 years old on the alleged onset date of his disability, May 1, 2011, when he suffered a cerebral vascular accident (stroke) that caused him to experience temporary paralysis in the left leg, along with numbness in the left arm and hand and pain in his left bicep (Tr. 148).

      Prior to his stroke, Robbins worked for 17 years as a journeyman in his family's heating and air-conditioning business as a sheet metal installer, a job that required him to perform medium to heavy exertional work (Tr. 39).  ALJ Mather determined in findings 6 and 17 of the hearing decision (Tr. 22, 26) that Robbins was not able to return to his past relevant work as a journeyman heating and air-conditioning sheet metal installer due to the functional limitations imposed by the residuals of his stroke.

      Robbins in his fact and law summary does not dispute the correctness of ALJ Mather's decision that Robbins was disabled through May 1, 2012, due to the functional limitations imposed by his severe impairments of severe cerebral vascular accident, hypertension and artery stenosis (Tr. 21).  Robbins also does not dispute finding of fact no. 5 concerning his residual functional capacity through the same date, May 1, 2012 (Tr. 21-22).  He likewise does not dispute findings of fact 9 and 10 in which ALJ Mather determined that his job skills did not transfer to other occupations and that no jobs existed in significant numbers that he was capable of performing so that he was under a disability through May 1, 2012 (Tr. 23).

      Robbins does not challenge finding of fact no. 12 of the hearing decision (Tr. 24) which ALJ Mather determined that Robbins' severe impairments remained the same after the May 1,

7

2012 date as they were before.  He agrees with findings of fact 17, 18 and 19 regarding his inability to return to his past relevant work, his current age category and his educational level (Tr. 24, 26-27).

Robbins does challenge findings of fact 4, 14, 15, 16, 21 and 22 in his fact and law summary (Tr. 21, 24, 26-27).  More specifically, he argues that substantial medical evidence of record does not support the conclusion of ALJ Mather that his severe impairments do not meet or equal the severity of listing 11.4 of the listing of impairments of 20 C.F.R. Part 404, Subpart B, Appendix 1 (Tr. 21, 24).  He also challenges the findings of ALJ Mather that he experienced substantial medical improvement that resulted in an increase in his residual functional capacity as of May 2, 2012, as ALJ Mather determined in findings 14 and 15 of the hearing decision (Tr. 24).

Along the same lines, Robbins maintains that substantial medical evidence does not support ALJ Mather's conclusion that he remains capable of performing a limited range of sedentary work excluding the climbing of ladders, ropes and scaffolds and work around unprotected heights or uneven ground, so long as he can work in a stationary position that does not require a lot of walking and is permitted to use a cane while walking (Tr. 24-26).  Robbins disputes the finding contained in finding no. 21 that there exists in the national economy significant numbers of jobs that he remains capable of performing beginning on May 2, 2012 (Tr. 26).  Finally, he challenges the ultimate conclusion of the hearing decision that his disability ended on May 2, 2012 (Tr. 27).

Robbins argues that his stroke on May 1, 2011, has resulted in weakness in his left hand, diminished left-sided sensory responses, and an abnormal gait that medically requires the use of a cane to walk.  According to him, his treatment history with Dr. Remmel of University

8

Neurologists confirms the extreme nature of his limitations (Tr. 409-416).  Dr. Remmel has documented all of the above residuals according to Robbins during annual follow up evaluations conducted on Feb. 20, 2014 and Jan. 8, 2015 (Tr. 417-422).

Robbins now maintains that ALJ Mather failed to give appropriate weight to the substantial medical evidence and the opinions of Dr. Remmel, his treating neurosurgeon. According to Robbins when the medical evidence is considered as a whole, along with his sworn testimony concerning the extent of his functional limitations, as well as the opinion of his treatment physician, it is clear that ALJ Mather's findings concerning his medical improvement and the increase in his residual functional capacity simply are not supported in the administrative record when one examines the evidence as a whole.

Robbins argues that he continues to require the use of a cane for support of his left leg and reports severe pain accompanied by muscle spasms in the leg which requires him to limit his use of it (Tr. 42).  Robbins by his testimony indicated that he remains capable of walking 100 feet before the affected leg begins to ache and can only stand for two minutes before he must sit (Tr. 48).  This testimony, according to Robbins, is entirely consistant with the limitations described by Dr. Remmel.  Further, Robbins notes that while ALJ Mather made a finding of substantial medical improvements as of May 2, 2012, his hearing decision cites no specific medical evidence to support such improvement.  Rather, ALJ Mather merely makes a passing reference to the fact that the most recent neurological treatment ended approximately 10 months prior to the hearing date of Jan. 29, 2013 (Tr. 24).

Robbins explains that throughout his post-operative treatment with Dr. Remmel his diagnosis on all occasions remained unchanged (Tr. 417-422).  That diagnosis included stroke syndrome, anxiety, hypertension, hyper lipidimea, carotid stenosis and late CVD effect which

9

includes hemiplegia affecting his non-dominant side (Id.).  These medical records of his treating

physician, according to Robbins, should be given greater and more significant weight in the

determination of the severity of his impairments.  Dr. Remmel in her treatment notes continued

to document persistent disorganization of motor function in the left upper and lower extremities

that resulted in an ongoing, sustained disturbance of his gait and station thereby medically

requiring the use of a cane in order to ambulate (Id.).  This medical evidence in Robbins' view

fully satisfies the criteria of listing 11.04, the listing for a central nervous system vascular

accident.  20 C.F.R. Part 404, Subpart P, appendix 1, listing 11.04.  Robbins points out correctly

that a finding that he satisfied the criteria of listing 11.4 would entitled him to an ongoing award

of disability benefits.

In his fact and law summary, Robbins next argues that ALJ Mather erred when he gave

little or no weight to the conclusions of consultative psychological examiner Greg Lynch (Tr.

395-401).  Examination by Jennifer Hale, a licensed psychological associate, determined that

Robbins would have moderate limitations in tolerating work stress, responding to his wo-

workers and his supervisors (Id.).  The same consultative examination report confirms his

continued prescription of anxiety medication along with medication for hypertension, high

cholesterol and post-operative complications due to his stroke.  Due to these post-operative

complications, the residuals out of his cerebral vascular accident, Robbins maintains that he

lacks the residual functional capacity, given his documented mental limitations, to engage in

substantial gainful employment since the onset date of May 1, 2011.

Robbins also argues in opposition to finding no. 21 that he is capable of making a

successful adjustment to alternative work of a limited nature that exists in significant numbers in

the national economy given his improved residual functional capacity as of May 2, 2012.  The

necessity for a sit/stand option, according to Robbins, would eliminate the alternative work of production workers and significantly reduce the remaining alternative work identified by the vocational expert, which consisted of such jobs as assembler and machine tender.  Given Robbins' hearing testimony concerning his inability to sit for more than 20 minutes or to be on his feet for more than two minutes, or to walk any substantial distance, all of the alternative work identified was eliminated when such limitations were assumed by the vocational expert. According to the VE, if Robbins could not work without a prolonged interference for up to six hours, then there would be no substantial gainful activity that he remained capable of performing after May 1, 2012.

Given that these limitations were documented by the medical records of Dr. Remmel, Robbins' treating neurosurgeon, he now concludes that the finding concerning the availability of alternative work he allegedly remained capable of performing after May 1, 2012, is not supported by substantial evidence.  Robbins re-emphasizes in his fact and law summary that ALJ Mather cited no specific facts of record that would support any substantial medical improvement that would have reduced the severity of his functional limitations after May 1, 2012.  To the contrary, in Robbins' view, all of the medical evidence of record confirms that he remained disabled following the closed period awarded him so that the decision of the Commissioner should be reversed and ongoing benefits awarded.

The Court considers all of Robbins' arguments in light of the evidence of record.  That evidence reflects that on May 3, 2011, Robbins reported to the emergency department at U of L Hospital complaining of weakness and numbness that started five days earlier (Tr. 277).  He reported that he had experienced such symptoms several times previously (Id.).  His medical history reflected a history of hypertension without any prior stroke.  Clinical impression upon

examination and diagnostic imaging was acute cerebral vascular accident (Tr. 278).  More

specifically, Robbins was diagnosed with acute right hemispheric ischemic stroke due to large

vessel atherosclerosis with right intracranial internal carotid artery stenosis (Tr. 267).  His

discharge summary from University Hospital indicated a history of untreated hypertension and

tobacco use and noncompliance with his blood pressure medication (Tr. 267).

Robbins was hospitalized for three days prior to his discharge on May 6, 2011 (Tr. 267-

269).  His discharge summary notes that Robbins' symptoms improved throughout his hospital

stay with "mild residual left-sided weakness."  Although he was considered for stenting due to

his "fairly significant right internal carotid artery intracranial stenosis," Robbins declined the

procedure and expressed his desire to continue only with medical management (Tr. 269).

Physical examination during his hospital stay revealed motor strength of 5/5 on the right side and

4+/5 on the left with muscle reflexes 3+ in the upper extremities and 2+ in the lower extremities

(Tr. 269-8).  Robbins was able to perform finger-to-nose and heel-to-shin tests without

substantial difficulty.

Treatment notes reflect that his symptoms improved throughout his brief hospitalization

(Tr. 269).  During physical therapy prior to his discharge, Robbins was able to ambulate 300 feet

without difficulty and demonstrated good dynamic balance without any weakness in the lower

left extremity although he did exhibit decreased coordination and weakness in the left upper

extremity (Tr. 314).  Robbins had no reported complaints of pain to his physical therapist (Id.).

He subsequently reported to his occupational therapist upon evaluation for outpatient therapy on

May 19, 2011, that he had numbness and tingling in the left bicep along with some numbness in

his left earlobe (Tr. 346).  However, Robbins' fine motor coordination scores for both hands fell

within the average range.  His grip strength was within functional limits throughout (Id.).

12

Robbins upon return for additional occupational therapy on May 26, 2011, the following week after his initial evaluation, again reported no complaints of pain currently (Tr. 352). Although Robbins indicated that performing tasks such as dressing himself took increased time, he remained capable of performing such tasks albeit with decreased endurance (Id.). On May 31, 2011, Robbins reported to his therapist soreness due to "a lot of heavy lifting over the weekend." Examination of the therapist's treatment notes for June of 2011, confirms that Robbins had no complaints of ongoing pain that month (Tr. 360-362, 366).

Following his discharge, Robbins remained under the treatment of neurologist Dr. Kerri Remmel (Tr. 378-81). Dr. Remmel examined Robbins on July 27, 2011, at which time she noted that his muscle strength, tone and bulk in both the upper and lower extremities were normal (Tr. 381). His response to touch, pinprick, vibration and position sensation also was normal as was his gait and station (Id.). At most he reported to Dr. Remmel only decreased reflexes in the left extremities. Dr. Remmel in her treatment plan specifically noted that Robbins was "okay to drive." (Tr. 381).

Dr. Remmel also examined Robbins on March 9, 2012 (Tr. 411-413). Her examination revealed no recurrent stroke symptoms since Robbins' hospitalization in May of 2011 (Tr. 411). The doctor's treatment notes reflect that Robbins made significant improvements following rehabilitation after his discharge from the hospital but continued to have post-stroke pain and motor deficits (Tr. 411). His reported medical history on that occasion included anxiety, carotid artery stenosis, hypercholestemia, hypertension, and stroke syndrome (Id.).

Robbins exhibited normal muscle strength in the upper and lower extremities along with normal muscle bulk and sensation to pinprick, vibration and position (Tr. 412). He likewise exhibited normal gait and station and was able to walk heel-toe without difficulty. His muscle

reflexes, however, were noted to be abnormal with hyperreflexia in the left upper and lower

extremity (Id.).  Robbins exhibited no abnormal or involuntary movements and his rapid

alternating movements were noted to be normal as well (Tr. 412).

When Robbins returned to Dr. Remmel on Jan. 29, 2013, he reported no new stroke

symptoms, although he continued to use a cane for support (Tr. 414-416).  He was noted to be

unsteady on uneven terrain and exhibited improving weakness in the right arm, but otherwise

had good coordination, no memory loss, no abnormal movements, no seizure, no difficulty

concentrating, no speech problems and normal attention (Tr. 414).  He was fully oriented with

intact recent and remote memory and had normal attention span and concentration (Tr. 415).  As

before, Robbins exhibited normal station and gait, normal sensation and no involuntary

movements (Tr. 416).  He was able to perform rapid alternating movements and exhibited no

dysmetria.  While the doctor did not clear Robbins to return to his past relevant work as a sheet

metal worker, she otherwise scheduled him to return in one year or sooner if needed (Id.).

Three different consultative examinations were performed on Robbins.  Dennis

Buchholz, Ph.D. and A. Scott Kochenrath, M.A., performed a consultative psychological

evaluation of Robbins on Oct. 24, 2011 (Tr. 383-387).  Robbins arrived for his evaluation

accompanied by his father, who drove, although Robbins has a valid driver's license (Tr. 383).

He was appropriately dressed and used a cane as an assistive device to ambulate.  He appeared to

be alert, cooperative and polite (Tr. 384).  A battery of psychological tests were performed

including the Wechsler Adult Intelligence Scale, Bender-Gestalt Visual Motor Test, Beck

Depression Inventory, Ray Memory Test, Finger Oscillation Test and clinical interview (Tr.

385).  Test results on the WAIS-IV revealed a full-scale IQ of 94, which placed Robbins in the

average range of intellectual functioning.  His Finger Oscillation Test to measure psychomotor

integration revealed impaired performance in both the dominant and non-dominant hands (Tr. 386).

Robbins' results on the memory scale all fell within the average range on general memory, auditory immediate index, visual delayed index, working memory index and auditory recognition delayed index (Tr. 386). His test results on the motor test, which measures immediate visual motor integration and fine motor skill, were appropriate without distortion. His self-report on the Beck Depression Inventory revealed responses within the moderately depressed range (Id.). Test results on the Rey 15 item memory test revealed no indication of malingering (Id.). Accordingly, Dr. Buchholz found Robbins' cognitive abilities to be within the average range and commensurate with his reported high school education level, family background and functioning prior to his stroke in May of 2011 (Tr. 387).

Although Robbins complained of numbness in the left hand and arm, anxiety, headaches and memory problems, he also reported that he remained able to clean, shop, cook, pay bills and do the laundry with assistance from his parents (Tr. 384). Dr. Buchholz determined that Robbins would have no difficulty relating to other individuals socially and that he retained the ability to understand and follow basic instructions as well as to be able to sustain attention to perform simple repetitive tasks and tolerate the daily pressures associated with work activity (Tr. 387).

Greg Lynch, Ph.D., with the assistance of Jennifer Hale, M.A., performed a consultative psychological examination in Louisville, Kentucky, on Jan. 9, 2012. During the initial interview, Robbins confirmed his high school graduation and certification as an HVAC sheet metal worker with two teenage sons (Tr. 395-96). He related a history of a stroke in the spring of 2011, that affected his left side resulting in neuropathy and decreased muscle tone in the left arm along with minor memory difficulties and difficulties articulating his thoughts (Tr. 396). Robbins reported

15

that he was not receiving any outpatient treatment for mental health and had never been prescribed any psychotropic medications or hospitalized for mental health reasons (Tr. 396). The consultative report indicates that Robbins had "an average ability to complete chores with assistance from his sons and was able to manage his own money."  (Id.).  He reported that he enjoyed watching tv, playing videogames and using the computer, that he sees his family daily. (Id.).

Mental status examination revealed a tense posture and gait with slightly slowed motor activity.  Robbins' attention and concentration were reported to be normal with mild deficits in memory (Tr. 397).  His eye contact was normal and facial expressions responsive.  His attitude was cooperative and effect and mood good with a normal speech flow and appropriate thought content.  (Id.).  Robbins revealed an average fund of knowledge with estimated intelligence in the average range as confirmed by the WAIS-IV test results which revealed a full-scale IQ score of 100, placing him in the average range of functioning (Tr. 397).

Robbins' scores on the Wechsler Memory Scale revealed auditory and visual memory scores within the low average range, although Robbins did exhibit difficulties on the immediate memory tasks (Tr. 399).  Based on test results, Robbins obtained a global assessment of functioning (GAF) score of 58 (Tr. 400).  Dr. Lynch in the summary portion of his report concluded that Robbins' capacity to understand, remember and carry out instructions for the performance of simple repetitive tasks was slightly limited with his ability to tolerate stress and pressure of day-to-day employment moderately limited and his ability to sustain attention and concentration for the performance of simple repetitive tasks unaffected (Id.).  The doctor found Robbins' ability to respond appropriately to supervision, co-workers and work pressures in a work setting to be moderately limited (Id.).

16

Dr. Edgar Lopez-Suescum performed a consultative physical examination of Robbins on Feb. 16, 2012 (Tr. 403-406).  On that occasion, Robbins related a history of cerebrovascular accident (stroke) accompanied by periodic paralysis of the left leg, numbness of the left hand and left arm (Tr. 403).  His chief complaint was weakness in the left upper extremity accompanied by pain in the left calf and thigh (Id.).  Robbins was noted to be alert, oriented with good communication skills (Id.).  Due to his instability, he related that he had been using a cane to ambulate since July of 2011 (Tr. 404).  Robbins related to Dr. Suescum that he had been advised by his neurologist not to drive (Tr. 404).

Physical examination by Dr. Suescum revealed that Robbins walked into and out of the examination room without assistance and mounted and dismounted the examination table without help (Tr. 404).  His tandem gait, tip-toe walking and heel walking was normal as was his ability to squat and hop (Tr. 405).  His grip strength, pinch strength and range of motion were reported to be within normal limits 5/5 (Tr. 408).  Neurological examination revealed normal deep tendon reflexes with no differences in motor strength in the upper and lower extremities on either side (Tr. 405).  Dr. Suescum determined that Robbins' ability to sit, stand, lift, carry, hear, speak and travel were normal (Tr. 405).

Non-examining state agency physicians, Drs. Marcia Turner and Carlos Hernandez (Tr. 71-76, 88-93) based upon their review of Robbins' medical records, determined that Robbins retained the residual functional capacity to occasionally lift 50 pounds and frequently lift 25 pounds, sit or stand for 6 hours in an 8-hour workday with an unlimited ability to push or pull (Tr. 73, 91).  They likewise similarly concluded that he could perform medium exertional level work without climbing of ladders, ropes or scaffolds (Tr. 74-75, 92).  Both doctors also

concluded that the medical records did not support the prescriptive use of an assistive device such as a cane in order for Robbins to ambulate (Tr. 76-93).

Robbins himself testified that he uses a cane to lean on and to take the weight off of his left leg when it becomes painful (Tr. 42). He acknowledged that he remains able to drive a car several days each week (Tr. 43). He reported that he reads, watches tv and spends time with his two teenage sons (Id.). Robbins estimated that he can carry 5-10 pounds and walk approximately 100 feet before his left leg begins to ache (Tr. 48). He reported during the hearing that he can stand only for about 2 minutes before he must sit down due to leg pain (Tr. 49). He estimated that he can sit for 15-20 minutes before he has to stand (Tr. 52).

Robbins related that he has some memory problems due to his stroke and occasionally is unable to remember having watched a tv show or having a conversation (Tr. 49-50). He further testified that he has difficulty when climbing stairs or when walking up inclines (Tr. 53).

At the hearing, VE Kenneth Anchor testified that Robbins' past relevant work as a heating and air-conditioning sheet metal worker would be precluded if it were assumed that Robbins were limited to light or sedentary work with limitations from climbing ladders, ropes, scaffolding and no exposure to hazardous machinery or work at unprotected heights or uneven ground accompanied by a requirement for the use of a cane in the non-dominant hand (Tr. 55-56). All medium and heavy work according to the VE would be eliminated with such assumptions (Id.).

Alternatively, light or sedentary work under such assumptions would exist in Kentucky according to the VE, who identified such jobs as small parts assembler, production worker and machine tender, jobs which according to the VE do not require significant ambulation from the employee's work station, nor preclude the use of a cane (Tr. 57). If it were assumed that

Robbins had a need to alternate sitting and standing, then Anchor concluded that the production worker job would be eliminated as alternative work, but the jobs of small parts assemble and machine tender would allow for a sit/stand option and would be sedentary or light work (Tr. 58). Assuming that Robbins were limited to walking a distance of only 10 feet, standing for 2 minutes and sitting for 20 minutes, VE Anchor testified that there would be no substantial gainful activity that he remained capable of performing with such limitations (Tr. 60).

*Listing 11.4 for Central System Vascular Accident.*

The Court begins its analysis with consideration of Robbins' challenge to findings of fact no. 4 and 13.  In these findings, ALJ Mather found that the claimant does not have an impairment or combination of impairments that meet or medically equal the severity of an impairment listed in Listing 11.04 of 20 C.F.R. Part 404, Appendix 1.  At step three, a claimant will be considered to be disabled if his impairment meets or equals one of the listings of impairments found in 20 C.F.R. Part 404, Subpart P, App. 1.  *McClellan v. Astrue,* 804 F. Supp.2 d 678 (E.D. Tenn. 2011).  The burden falls on the claimant to prove every element of the applicable listing.  *King v. Sec'y of H&HS*, 742 F.2d 968, 974 (6th Cir. 1986).

When the claimant presents evidence of an impairment that meets or equals all of the requirements for a particular listed impairment, along with the 12-month duration requirement, a finding of disability is required without regard to the claimant's age, education or work history. *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *see also, Sullivan v. Zebley*, 493 U.S. 521, 531-33 (1990) ("The Secretary [now Commissioner] explicitly has set the medical criteria defining the listing impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent

19

an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'") (citing 20 C.F.R. §416.925(a)(1989)); *Bowen v. City of New York*, 476 U.S. 467, 471 (1986) ("If a claimant's condition meets or equals the listed impairments, he is conclusively presumed to be disabled and entitled to benefits; if not, the process moves to the fourth step").

An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by the medical evidence are equivalent in severity and duration to that of a listed impairment. *See Land v. Sec'y of H&HS*, 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. §1526(b)). A decision of medical equivalency, however, must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques. *Id.* Finally, an ALJ is not required by Sixth Circuit case law to individually discuss each element of the record when considering the listings so long as the ALJ demonstrates that he has considered the totality of the record. *Rosic v. Comm'r of Soc. Security*, 2010 WL 3292964 at *3 (N.D. Ohio Aug. 19, 2010) (citing *Gooch v. Sec'y of H&HS*, 833 F.2d 589, 591 (6th Cir. 1987)).

Because the listings establish a presumption of disability without consideration of a claimant's age, education or work experience, and represent an automatic "screening in" based only on a claimant's medical findings, the claimant must meet the strict evidentiary standard described above. *Zebley*, 493 U.S at 532. Robbins has not satisfied this strict standard as ALJ Mather correctly concludes in his hearing decision.

Examination of Dr. Remmel's medical records does not confirm disorganization of motor function in at least two extremities that resulted in sustained disturbance in gait and station as required by the Listing. Instead, the medical evidence reflected that Robbins retained equal

20

strength in his extremities and his ability to stand, sit, left, carry and handle was determined upon

examination to be unimpaired (Tr. 24, 405).  He likewise displayed the ability to tandem walk,

tip-toe walk, heel walk, squat, hop and perform fine and gross manipulations (Id.).  Treatment

notes of Dr. Remmel confirmed that Robbins had a normal gait and normal muscle strength in

both the upper and lower extremities as of March of 2012 (Tr. 412).  In fact, the following year,

Dr. Remmel confirmed these prior examination results in her treatment notes from Robbins' visit

on Jan. 29, 2013 (Tr. 414-416).  Once again, Robbins was able to exhibit a normal gait and

station and proceeded to walk heel toe and in tandem without difficulty (Id.).  Given these

medical records, which constitute substantial evidence in support of ALJ Mather's determination

at step 3, Robbins has failed to carry his burden below to show that the severity of his condition

met or medically equaled the criteria of listing 11.04. *See Mughni v Astrue,* No. 1:11–cv–18,

2011 WL 6307831 at *12 (S.D. Ohio Nov. 16, 2011)(claimant's vascular accident failed to satify

the criteria of the listing where claimant exhibited a full range of motion in the upper extremities,

normal bilateral muscle strength and a normal gate); *Thompson v Astrue, No.* 1:10–cv–371, 2011

WL 3861693 at *9-10 (S.D. Ohio July 28 2011)(same).


*Medical Improvement.*

ALJ Mather in finding of fact 14 and 15 determined based upon the medical evidence of

record that as of early 2012 Robbins' physical condition and symptoms began to improve, which

led to an increase in his residual functional capacity to perform basic work duties (Tr. 24).

Under the regulations, medical improvement is defined to mean any decrease in the medical

severity of impairments present at the time of the most recent favorable that a claimant was

disabled.  See 20 C.F.R. §§404.1594(c)(1), 416.994(b)(1)(i).  *See Kennedy v. Astrue,* 247 Fed.

Appx. 761, 765 (6th Cir. 2007)(discussing medical improvement). The determination of medical improvement is part of the longer, 8-step sequential evaluation process prescribed in 20 C.F.R. §404.1594(f), which deals with determination of benefits when a claimant is no longer disabled. *See, Estep v. Astrue*, No. 2:08-CV-559, 2009 WL 2929320 at *1, (S.D. Ohio, Sept. 8, 2009). *See also, Cobb v. Comm'r of Soc. Sec.,* No. 1:09-CV-51, 2010 WL 565260 at *1-2 (W.D. Mich. Feb. 11, 2010) (discussing the 8-step process used when making a determination of whether an improvement in a physical or mental impairment warrants the termination of disability benefits).

Here, examination of the record reveals that ALJ Mather's decision was fully supported in his determination that Robbins had made medical improvement as of May 2, 2012.  As ALJ Mather noted in his hearing decision, the consultative examination report of Dr. Lopez-Suescum (Tr. 405) revealed that Robbins exhibited equal strength in the extremities and was able to stand, sit, lift, carry and handle objects without significant impairment (Tr. 405).  He was able to tandem walk, tip-toe walk, heel walk, squat, hop, and perform fine and gross manipulation with the hands (Id.).

Further, in March of 2012, Robbins upon examination by Dr. Remmel exhibited normal cranial nerves, normal muscle strength in both the upper and lower extremities, normal gait and station and normal sensation (Tr. 412).  In fact as correctly noted, Dr. Remmel released Robbins to drive (Tr. 413).  Dr. Remmel found no evidence of any severe impairments related to Robbins' mental abilities.  Robbins' ability to concentrate, maintain attention and memory were all noted to fall within the normal to low normal range (Tr. 414).  Dr. Remmel in her own treatment notes of March 2012, noted that Robbins' remote and recent memory were intact (Tr. 414).

ALJ Mather also correctly weighed the opinions of the treating and examining physicians.  He properly considered the opinions of the non-treating state agency consultants which he discounted due to Robbins' need for a cane as determined by his treating physician (Tr. 25, 74-75, 92, 414).  Because Robbins needed an assistive device to ambulate, ALJ Mather rejected the opinions of non-examining doctors Hernandez and Turner that Robbins remained capable of performing medium exertional work (Tr. 25).  ALJ Mather in the Court's view also properly rejected the opinions of consultative examiner Dr. Lopez-Suescum who opined that Robbins remained able to sit, stand, lift, carry and handle normally.

The Court agrees with the Commissioner that ALJ Mather appropriately afforded great weight to the opinion of consultative examiner Dennis Buchholz who concluded that Robbins retained the ability to interact socially, follow basic instructions, sustain attention for simple tasks, tolerate stress and pressure and manage his own finances (Tr. 382-87).  Dr. Buchholz found no medical basis upon examination for a diagnosis of a mental impairment (Tr. 387).  To the contrary, Robbins exhibited intact memory upon examination (Tr. 412-415).  Robbins successfully completed the Wechsler Adult Intelligence Scale-Fourth Edition (Tr. 385) and his concentration, attention and memory were determined to be normal (Tr. 385).

In contrast, ALJ Mather did not afford weight to the assessment of consultative psychological examiner Greg Lynch (Tr. 395-410) and his determination that Robbins would have moderate limitations in tolerating work stress and responding to co-workers and supervisors (Tr. 400).  Robbins, as ALJ Mather correctly noted in his hearing decision, had no prior history of seeking professional mental health treatment for any social deficits or mental health treatment for that matter (Tr. 26).  At most, medical records do reflect a diagnosis of anxiety treated with an anti-anxiety medication, Sitalophran (Tr. 413).  Robbins' conclusion to the contrary

23

concerning this portion of ALJ Mather's decision is not supported by any specific citation to the medical record as best the Court can determine.  Accordingly, substantial evidence does support ALJ Mather's decision with respect to the weight that he chose to accord the various treating and non-treating medical service providers.

In particular, the Court concludes that ALJ Mather accorded appropriate weight to the medical record involving Dr. Remmel.  First, it must be noted that Dr. Remmel, Robbins' treating neurosurgeon, expressed no opinion that reflected a professional judgment about the nature and severity of Robbin's impairments and what he remained capable of doing despite them.  See 20 C.F.R. §404.1527(a)(2).  In other words, while Dr. Remmel's treatment notes may indeed contain her assessment and diagnosis of Robbins' condition, Dr. Remmel offered no "opinion" concerning his functional limitations as the result of his stroke in May of 2011.  Accordingly, ALJ Mather did not violate the treating source rule as he did not fail to place appropriate weight on any "opinion" of Dr. Remmel given that there was none such as that recognized by the federal regulations.


*Residual Functional Capacity.*

Robbins next turns to finding of fact 16 of ALJ Mather's hearing decision (Tr. 24-26).  In this finding, the ALJ concludes that Robbins as of May 2, 2012, had the residual functional capacity to perform sedentary work limited from climbing ladders, ropes and scaffolds and only occasional climbing of ramps and stairs (Tr. 24).  The ALJ also determined in the same finding that Robbins must avoid concentrated exposure to machinery and should never work around unprotected heights or uneven ground and that he should work in a stationary position that does

not require substantial walking and that he will need a cane in the non-dominant hand when performing extended walking (Id.).

A claimant's residual functional capacity is the most that he or she can do despite his or her impairments.  *See Franson v. Comm'r*, 556 F.Supp.2d 716, 731 (W.D. Mich. 2008) (citing 20 C.F.R. §404.1545(a)).  The formulation of a claimant's RFC is the responsibility of the ALJ.  *Paul v. Astrue*, 827 F. Supp.2d 739, 745 (E.D. Ky. 2011).  In making this RFC determination the ALJ must consider all of the relevant medical and other evidence.  20 C.F.R. §404.1545(e).  See *Hickey-Haynes v. Barnhart*, 116 Fed. Appx. 718, 726 (6th Cir. 2004) ("An RFC is the assessment of the claimant's maximum remaining capability to perform work-related activities despite the physical and mental impairments caused by his or her disability.") (citing SSR 96-8p).

In reaching an RFC determination, the ALJ is to assess the physical abilities, mental abilities, and other abilities affected by the impairments of the claimant to determine the total limiting effect of all such impairments, severe and non-severe.  *Dragon v. Comm'r*, 470 Fed. Appx. 454 at *9 (6th Cir. 2012).  The ALJ also may consider statements made by the claimant on what he or she is able to do, as well as descriptions and observations of such limitations provided by the claimant's neighbors, friends or other persons.  20 C.F.R. §404.1545(a)(3).  An RFC finding by the ALJ is used to determine whether a claimant can perform his or her past relevant work at step 4 of the evaluation process, and whether the claimant can adjust to other work existing in the national economy at step 5.  *Eslinger v. Comm'r*, 476 Fed. Appx. 618 at **2-3 (6th Cir. 2012).

ALJ Mather in his hearing decision carefully set forth the medical evidence of record that supported his RFC determination in finding of fact no. 16 (Tr. 24-26).  The medical evidence as

discussed above is entirely supportive of an RFC for sedentary work with the limitations expressed by the ALJ in his decision.  No substantial medical evidence of record supported any non-exertional, mental limitations given the absence of any treatment history for mental illness along with the essentially normal consultative psychological examination results summarized above.

The Court also agrees with the Commissioner in her fact and law summary (DN 15, pp. 14-15) that ALJ Mather correctly accorded less than full credibility to  Robbin's testimony concerning his functional limitations after May 2, 2012, the date on which medical improvement occurred.  An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight, and judicial deference will be given to the ability of the ALJ to observe the demeanor and credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute deference.  His or her assessment of a claimant's credibility must be supported by substantial evidence.  *Beavers v. Sec'y,* 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant.  *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters,* 127 F.3d 525, 531 (6th Cir. 1997)).  The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility."  Id. (citing Rogers, 486 F.3d at 247) (citing SSR 96-7p)).  Under SSR 96-7p, the ALJ must in the hearing

26

decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers,* 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the aforementioned factors of: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. Id. at 823 n. 14 (citing SSR 96-7p).

Also included among the evidence that the ALJ must consider when making a credibility determination are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. Id.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of

claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning,* 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r,* 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing Walters, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.' "  *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Here, Robbins testified during the administrative hearing concerning the severe pain and muscle spasms that he experienced in his left leg and his need for a cane to "get the weight off" the leg (Tr. 42).  He indicated that he could only lift 5-10 pounds and could only walk 100 feet before his left leg began to ache (Tr. 38-39).  He testified that he could only stand for approximately 2 minutes before he would need to sit down (Tr. 48).  The medical evidence however, does not support the severity of these limitations.

Physical examination by Robbins' treating neurologist, Dr. Remmel, revealed normal muscle strength in both the upper and lower extremities along with normal muscle bulk, normal gait and normal sensation (Tr. 412-415, 416).  Further, Dr. Remmel released Robbins to drive his automobile (Tr. 413).  Consultative examiner Dr. Lopez-Suescum concluded upon examination that Robbins exhibited equal strength in his extremities and was unimpaired in his ability to sit, stand, lift, carry and handle (Tr. 405).  Given the results of the consultative examination

28

performed by Dr. Suescum along with the treatment notes from Dr. Remmel, the Court cannot agree with the claimant that ALJ Mather somehow erred in according only limited credibility to Robbins' hearing testimony concerning his perceived limitations.  The result of the consultative physical examination and the treatment notes are directly contrary to that testimony so that ALJ Mather did not err in his credibility determination.

*Substantial Number of Alternative Jobs.*

In his final argument, Robbins challenges the finding of ALJ Mather that he remained capable of performing a substantial number of alternative jobs given his age, education, and residual functional capacity.  ALJ Mather found in finding of fact no. 21 that in light of these factors jobs exist in significant numbers in the national economy that Robbins remains capable of performing jobs such as small parts assembler, production worker and machine tender (Tr. 26-27).  Robbins now maintains that the hypothetical question posed by the ALJ to the VE did not adequately account for his limitations and therefore is insufficient to support the burden of the Commissioner at that final step of the sequential evaluation process.

The testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant.  *Ealy,* 594 F.3d at 512-13 (citing *Varley v. Sec'y*, 820 F.2d 777, 779 (6th Cir. 1987)).  The hypothetical question to the VE is not required to include a list of the claimant's medical conditions.  *Wadd v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004).  The ALJ may present a hypothetical to the VE on the basis of the ALJ's assessment of the claimant's credibility.  *Jones v. Comm'r*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citing *Townsend v. Sec'y*, 762 F.2d 40, 44 (6th Cir. 1985)).  The hypothetical question need not

29

incorporate those limitations asserted by the claimant that are properly rejected by the ALJ based upon his independent review of the record.  *Foster v. Halter*, 279 F.3d 348, 356-57 (6th Cir. 2001).

Here, the hypothetical question posed by ALJ Mather (Tr. 56) to VE Anchor included all of the limitations that were set forth in the RFC determination found in finding of fact no. 16 (Tr. 24-26).  The hypothetical question was supported by the medical record as determined by ALJ Mather.  What Robbins appears to argue, in effect, is that the hypothetical question posed by the ALJ did not include the subjective limitations of the claimant as set forth in his hearing testimony concerning his inability to sit for more than 20 minutes, stand for 2 minutes or walk more than 10 feet.  With those assumptions, as VE Anchor testified, there would be no alternative work that Robbins remained capable of performing in the national economy.

While that may well be so, ALJ Mather already determined in his hearing decision and the Court agrees, that Robbins' credibility was suspect with respect to the extent of and severity of his physical limitations given the consultative examination test results and the treatment notes of his treating neurosurgeon.  Consequently, ALJ Mather was not required to incorporate into his hypothetical question subjective limitations that were not supported by the medical record. Further, even with the elimination of the production worker position due to the assumption of a sit/stand option, there remain alternative work that constitute substantial gainful activity in the form of the small parts assembler and machine tender jobs identified by VE Anchor at the hearing (Tr. 26-27).

In light of the testimony of the VE based upon the hypothetical question that appropriately included all of the claimant's limitations, the Court concludes that ALJ Mather properly found in finding of fact 22 that Robbins was no longer disabled after May 1, 2012.

30

Robbins failed to carry the burden below to prove that his disability continued after May 1, 2012.

For the above reasons, the decision of the Commissioner shall be affirmed and the complaint

dismissed with prejudice.

Cc:     Counsel of Record